**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**GENETTA V. COLEMAN,**

     **Plaintiff,**

v.                               **Case No.: 3:10-cv-1254**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

## MEMORANDUM OPINION

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 11 and 12).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 5 and 6).

The Court has fully considered the evidence and the arguments of counsel.  For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.  Procedural History

Plaintiff, Genetta Coleman (hereinafter "Claimant"), filed an application for SSI on April 2, 2004, alleging a disability onset date of January 29, 2000 due to "back

problems, left knee deteriorated, anxiety, heart problems, [chronic obstructive pulmonary disease] COPD, scoliosis." (Tr. at 88–95, 98). The application was denied by the Social Security Administration (hereinafter "SSA") on June 16, 2004. (Tr. at 76–80).[1] Claimant requested reconsideration on April 2, 2005 (Tr. at 67), which was denied on August 4, 2005. (Tr. at 68–70). Claimant then requested a hearing before an administrative law judge (hereinafter "ALJ"). (Tr. at 66). A hearing was scheduled for February 2, 2007 (Tr. at 45–48) but was subsequently dismissed by the ALJ due to the Claimant's failure to appear pursuant to 20 C.F.R. 416.1457(b). (Tr. at 16–18). Claimant successfully appealed the dismissal of her case to the Appeals Council of the SSA (hereinafter "Appeals Council"), which remanded her case to the ALJ on January 9, 2009. (Tr. at 13–15).

While Claimant's 2004 application was pending with the Appeals Council, Claimant filed another application for SSI on January 30, 2008 alleging a disability onset date of January 9, 2008. (Tr. at 81–84). Claimant's 2008 application was denied on initial review and upon reconsideration. (Tr. at 58–65). Following this denial, Claimant requested a hearing in front of an ALJ, which was conducted by the Honorable Andrew J. Chwalibog, ALJ, on November 3, 2009. (Tr. at 36). Pursuant to the Appeals Council's remand of Claimant's 2004 application, the ALJ consolidated the 2004 application with Claimant's 2008 application.[2] (Tr. at 23). The ALJ denied Claimant's claims on January 26, 2010. (Tr. at 20–33). The ALJ's decision became the

---

[1] In addition to the present application, Claimant previously filed SSI applications on February 25, 2002, October 23, 2002, and June 4, 2007. Each of these applications was denied at the initial level and not appealed further. (Tr. at 23).

[2] The 2004 and 2008 applications contained different onset dates. The ALJ used the onset date of January 29, 2000 set forth in the 2004 application for the purposes of his opinion. (Tr. at 23).

final decision of the Commissioner on August 26, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 9–12). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 9–12). Consequently, the matter is ripe for resolution.

## II.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* at § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* at § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* at § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal any of the impairments , the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* at § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* at § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868–69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the

4

severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(2).

In the present case, at the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since April 2, 2004, the date of the first application for benefits. (Tr. at 25, Finding No. 1). The ALJ acknowledged the Claimant had briefly worked after the alleged onset date, but considered these efforts to be unsuccessful work attempts. (*Id.*) Turning to the second step of the evaluation, the ALJ determined that Claimant had the following severe

impairments: heart disease, lumbosacral degenerative disk disease, and left knee pathology. (Tr. at 25, Finding No. 2). The ALJ further concluded that Claimant's dizziness, chronic obstructive pulmonary disease, major depression, and generalized anxiety disorder were not severe. (*Id.*). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments detailed in the Listing. (Tr. at 28, Finding No. 3). Accordingly, the ALJ assessed Claimant's RFC, finding:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: may lift and/or carry 20 pounds frequently and 50 pounds occasionally; may stand/walk about 4 hours in an 8-hour work day, 1 hour without interruption; may sit about 4 hours in an 8-hour work day, 2 hours without interruption; may occasionally climb ramp/stairs, stoop, kneel, or crouch; never climb ladder/scaffold, or crawl; and must avoid hazards (machinery or heights), and may have only one occasional exposure to moving mechanical parts, humidity and wetness, vibration, cold, dusts, odors, gases and pulmonary irritants.

(Tr. at 28, Finding No. 4).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 32–33, Finding Nos. 5–9). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) she was born in 1963, and at age 40, was defined as a younger individual age 18-49 on the date the application was filed (20 CFR 416.963); (3) she had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because, under the Medical-Vocational Rules, the evidence supported a finding that the claimant was "not disabled" regardless of whether she had transferable job skills. (Transcript at 32, Finding Nos. 5–8). Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment

positions that existed in significant numbers in the national economy, such as a light night guard, light packer, machine tender and sedentary inspector. (Tr. at 32–33, Finding No. 9). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 33, Finding No. 10).

## III.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.   In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)).   If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision."  *Blalock,* 483 F.2d at 775.  A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is

supported by substantial evidence.

**IV.**   **Claimant's Background**

Claimant was 40 years old at the time she filed her application for benefits and 45 years old at the time of her administrative hearing. (Tr. at 32). Claimant had previous experience working as a stock person, cashier, receiving clerk, and delivery worker.  (Tr. at 32). Claimant had a high school education, attended three years of college, (Tr. at 889) and was proficient in English. (Tr. at 32).

**V.**   **Relevant Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

**A.**   **Treatment Records**

Claimant first sought treatment for back pain in August 2000. On August 28, 2000, Claimant presented to Pleasant Valley Hospital ("PVH") after injuring her back at work as a stockperson. (Tr. at 442, 852). The x-ray taken of Claimant's thoracic spine showed minimal degenerative changes that were suggestive of "chronic findings." (Tr. at 442). No other changes or unusual findings were reported. (*Id.*). Claimant returned to PVH several months later on November 16, 2000, again complaining of backaches and problems with her spine.  (Tr. at 441). A bone scan of Claimant's spine was "unremarkable" with no focal points of abnormal bone activity. (*Id.*) Claimant returned to PVH on May 11, 2001, complaining of lower back pain. (Tr. at 440). Accordingly, a MRI of Claimant's lumbar spine was performed. (*Id.*). The MRI revealed mild signal loss within the L5/S1 disc and the absence of disc herniation. (*Id.*).

On January 24, 2002, Claimant presented to Taylor Chiropractic for back pain. (Tr. at 337). In her new client intake form, Claimant noted that her main complaint was pain in her upper and lower back, particularly in the shoulder blades and hips. (Tr. at 338–39). X-rays were taken, which were negative for fractures, but showed mild hyper lordosis[3] of the lumbar spine with normal S1 joints. (Tr. at 337). In addition, the film suggested that Claimant's hips were moderately unleveled. (*Id.*)

A month later on February 27, 2002, Claimant began treatment with James Wagner, DO, at Point Clinic. Dr. Wagner served as Claimant's primary care physician until July 2004. (Tr. at 230–69). Claimant's complaints were consistent throughout this time period; her main complaints were of back pain, knee pain, and anxiety. (*Id.*). Claimant also complained of migraine headaches, asthma, and weight loss. (*Id.*). Dr. Wagner diagnosed Claimant with chronic back pain, scoliosis, arthritis in her left knee, fibromyalgia, anxiety, and depression. (*Id.*).

Over the course of Claimant's treatment, Dr. Wagner ordered numerous x-rays of Claimant's chest, spinal area, and knees. (Tr. at 426–39). Each set of chest x-rays was negative without pulmonary or cardiac abnormalities until November 19, 2003 when a chest x-ray suggested mild COPD. (Tr. at 427). A June 2004 x-ray confirmed the finding of mild COPD. (Tr. at 424). Similarly, the x-rays of Claimant's left knee and left patella were without abnormalities. (Tr. at 437). Computed tomographies (CT) of Claimant's head were conducted in November 2003 and March 2004; both were negative. (Tr. at 282, 428).

---

[3] Hyper lordosis is defined as "exaggerated anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side." *Dorland's Medical Dictionary for Health Consumers*, 2007.

In January 2003, Claimant was referred by Dr. Wagner to Michael Englund, DO, for complaints of chest pain of unknown etiology. (Tr. at 326–34). Dr. Englund ordered an EKG, which showed normal sinus rhythm with non-specific STT wave changes.  An echocardiogram revealed leaky mitral and tricuspid values, but no severe valvular disease. Dr. Englund recommended right and left heart catheterization and selective angiography to investigate the source of Claimant's pain. (Tr. at 326–27). On February 25, 2003, these procedures were performed; the results were essentially unremarkable with a normal ejection fraction and mild mitral valve regurgitation. (Tr. at 323–325). Dr. Englund arranged a neurological consultation to rule out thoracic outlet syndrome as the cause of Claimant's chest pain.  The consulting physician found no evidence of thoracic outlet syndrome or focal neurological deficits and suggested nerve conduction studies to rule out carpal tunnel syndrome. (Tr. at 316). In March 2003, after reviewing an EMG and an ultrasound of Claimant's heart and upper extremities, Dr. Englund noted that he cardiac workup was "somewhat negative" but should be further examined for small vessel coronary disease. (Tr. at 312–13, 315).

Claimant continued to complain of chest pain to Dr. Wagner.  (Tr. at 254).  She described the pain as sharp and reported that she also was having "a lot of stress." (*Id.*)  In early December 2003, Claimant returned to Dr. Englund complaining that her chest pain was progressing and she had become extremely fatigued.  Dr. Englund performed another cardiac catheterization and echocardiogram.  After reviewing the results, he diagnosed Claimant as suffering from angina pectoris with normal ventricular function. (Tr. at 287–90).  A follow-up CT scan of Claimant's chest taken in December 5, 2003 revealed signs of granulomatous disease. (Tr. at 286).

Claimant next saw Dr. Englund on March 24, 2004. Claimant reported that she continued to have chest pain and had actually "passed out."  (Tr. at 283–84).  Dr. Englund noted that Claimant's prior cardiac work-up had been negative, but he was concerned about her syncopal episodes. He recommended that she see a vascular specialist to determine if her episodes were caused by a vascular type disorder.  (Tr. at 284).  He also indicated that she needed to continue working on aggressive risk modifications. (*Id.*).

Dr. Wagner also referred Claimant to Robert McCleary, DO, for evaluation of her left knee pain. Dr. McCleary recommended a lateral release operation, which he performed successfully with some relief of Claimant's pain. (Tr. at 347–48). However, several months after surgery, Claimant slipped and fell in her bathtub, hitting her knee and causing anterior knee pain.  On June 1, 2004, Dr. McCleary examined Claimant's knee and diagnosed patellar chondromalacia[4] in Claimant's left knee, which was later confirmed by an arthroscopic examination. (Tr. at 347, 421). In July 2004, Dr. McCleary prescribed physical therapy for Claimant's knee. (Tr. at 346). Unfortunately in August 2004, Claimant tripped and fell again, this time spraining her medial collateral ligament (MCL). Dr. McCleary recommended continued physical therapy and prescribed Lortab for pain. (Tr. at 345). Claimant reported her third fall in November 2004, stating that she had tripped over a bench in her yard and landed on her left knee, lower leg, and left ankle.  Dr. McCleary noted moderate swelling of the knee and abundant bruising over the distal aspect of the tibia and fibula.  (Tr. at 344).

---

[4] Patellar chondromalacia refers to the progressive erosion of the articular cartilage of the knee joint, that is the cartilage underlying the kneecap that articulates with the knee joint. *Mosby's Medical Dictionary*, 8th edition, 2009.

X-rays were negative for fractures.  Dr. McCleary prescribed physical therapy, Lortab, and an ankle stabilizing brace.  (*Id.*).

In October 2004, Claimant switched primary care physicians and began treating with Brenton Morgan, MD. (Tr. at 447).  At the initial visit, Claimant reported knee pain and coronary artery disease with mitral valve regurgitation. (*Id.*). Dr. Morgan performed an examination and ordered x-rays of Claimant's left lower leg, left ankle, left knee and chest.  The skeletal x-ray findings were unremarkable, and Dr. Morgan noted "minimal degenerative changes" in Claimant's left knee. (Tr. at 403–04). The chest x-ray showed air trapping suggestive of mild chronic obstructive pulmonary disease (COPD). (Tr. at 408). Dr. Morgan diagnosed Claimant as suffering from COPD, valvular heart disease, chronic back pain, and depression. (Tr. at 386–87, 445).  He ordered an exercise stress test (myocardial perfusion scan) in May 2005, which revealed that Claimant's heart rate when stressed and when resting was normal. (Tr at 380–82).

On February 19, 2006, Claimant was evaluated at PVH's Emergency Department for complaints of lower back pain that had worsened in the prior two days. (Tr. at 691–93). The attending physician diagnosed Claimant as suffering from an acute exacerbation of musculoskeletal pain in the lower back. She was given Flexeril for the pain and told to apply heat.

Claimant subsequently was referred to Robert Lewis, MD, at Pleasant Valley Hospital Neurophysiology Center for leg and hand tremors and restless leg syndrome. (Tr. at 567–68). After completing his examination, Dr. Lewis diagnosed restless leg syndrome by history; tremor with family history of tremor, but without evidence of Parkinson's Disease; and numbness in Claimant's upper extremities that could signify

carpal tunnel syndrome. Dr. Lewis scheduled nerve conductions studies to rule out carpal tunnel syndrome. (*Id.*). The nerve conduction studies showed no evidence of carpal tunnel syndrome or ulnar neuropathy. (Tr. at 551–53).  X-rays of Claimant's lumbar spine and hips likewise were normal with no evidence of acute fracture or disease. (Tr. at 554, 642).

In February 2007, Claimant again switched primary care physicians to Randall Hawkins, MD. Claimant's complaints were consistent with her past medical concerns: pain in her lower back and hips; angina; depression; and anxiety. (Tr. at 636–37).  Dr. Hawkins ordered diagnostic studies including an echocardiogram, myocardial perfusion spect scan, and a chest X-ray. (Tr. at 617–19, 635). These studies were negative for abnormalities. (*Id.*). Around this time, Claimant returned to Dr. Lewis for leg weakness, knee pain, and low back pain that, according to Claimant, moved down her leg causing numbness in both feet. (Tr. at 551-553).  Dr. Lewis performed nerve conduction studies, which confirmed normal nerve patterns with no evidence of generalized polyneuropathy, myopathy, or left lumbosacral radiculopathy.  (Tr. at 551-552).

On March 16, 2007, Dr. Hawkins examined Claimant in follow-up, documenting no evidence of angina or hypertension. (Tr. at 632–34). Further, Dr. Hawkins found no obvious neck or back pathology, depression, or psychosis. (Tr. at 682–84). In April 2007, he ordered a MRI of Claimant's lumbar spine and hip, which revealed a disc bulging at the L5-S1 level.  The imaging showed no disc herniation and the remainder of the findings were normal. (Tr. at 613–14).  Dr. Hawkins ordered another CT scan of Claimant's head in July of 2007; the results were normal. (Tr. at 600). Dr. Hawkins performed an EKG on Claimant and found a possible left atrial enlargement and a

nonspecific T wave abnormality.[5]  (Tr. at 603–04). In August 2007, Claimant had another X-ray of her left hip. The X-ray showed no fracture or abnormality with Claimant's hip. (Tr. at 598–99). Two days later, Claimant presented to the PVH Emergency Department with complaints of severe lower back and hip pain. (Tr. at 675-676).  She was treated and released.

Following a car accident in October 2007, Claimant was taken to the Emergency Department for complaints of pain in her chest, abdomen, and back. A CT scan of Claimant's abdomen and X-rays of her spine, pelvis, right shoulder, and chest were completed. (Tr. at 656–58). The CT scan showed no gross abnormalities. (Tr. at 668). The X-rays showed evidence of mild degenerative arthritic changes in Claimant's lower cervical spine but otherwise evidenced a normal spine, pelvis, right shoulder and chest. (Tr. at 669–73). Claimant was discharged with instructions to consult with her primary care physician and push fluids.  (Tr. at 658).  Six days later, Claimant returned to the Emergency Department complaining of pain in her right shoulder, left rib, sternum, and left flank, which she attributed to the automobile accident. The attending physician ordered a chest CT scan to cover the shoulders, renal area, and sternum.  (Tr. at 651).  The scan showed no acute process, such as fractures, but did reveal a granuloma in the right upper lung lobe and some calcifications in the right hilar nodes. (Tr. at 652).

One week later, Claimant saw Dr. Hawkins in follow-up and complained of "pain all over."  (Tr. at 593–94). Dr. Hawkins wrote a note stating that Claimant was unable to work at present due to the motor vehicle accident. (Tr. at 592). In December

---

[5] A T Wave represents repolarization or recovery of the ventricles. *Dorland's Medical Dictionary for Health Consumers*, 2007.

2007, Claimant had an MRI performed on her right shoulder for a possible rotator cuff tear. (Tr. at 649). The MRI indicated minimal joint arthroplasty and mild suacromial/subdeltoid bursitis; no other problems were observed. The rotator cuff was intact. (*Id.*).

John Wade, MD, began treating Claimant in March 2008 for ear pain, tinnitus, asthma and allergies. (Tr. at 804). At the request of Dr. Wade, an X-ray was taken of Claimant's chest, which showed healing fractures of the left 7th and 8th ribs. (Tr. at 798). Dr. Wade prescribed medications for Claimant to lessen her allergic reactions and improve her breathing. (Tr. at 795). He also performed an audiological study on Claimant, which confirmed that her hearing was within normal limits. (Tr. at 806).

Claimant returned to treatment with Dr. Wagner in April 2008, complaining of tachycardia and chest pains. (Tr. at 735). She stated that she "feels her heartbeat in [her] throat" and was having increased "stress/anxiety at home." (*Id.*). Dr. Wagner recommended an EKG and thyroid panel. He diagnosed osteoporosis; tachycardia; and chest pain. (Tr. at 734). In October 2008, Dr. Wagner completed a statement of disability for West Virginia's Medical Review Team. Dr. Wagner noted that Claimant suffered from COPD, chest, lumbar spine pain, hip pain, anxiety, and depression. (Tr. at 731–33). Dr. Wagner concluded that Claimant was not employable and would likely remain permanently unable to work. (*Id.*).

On November 25, 2008, Dr. Lewis re-examined Claimant for low back and left leg pain at the request of Dr. Wagner and Dr. Wade. (Tr. 749–51, 782–84). He diagnosed Claimant with lumbar region disc disorder; lumbosacral radioculopathy; left lower leg pain; and lumbago. (*Id.*). Dr. Lewis ordered an EMG, a MRI of the spine, and hip and pelvis X-rays. The MRI of Claimant's lumbar spine showed evidence of an old

fracture of the superior end plate of L2 and herniation of the left posterolateral disc at L5/S1 causing compression or displacement of the left traversing nerve. (Tr. at 745). The EMG and nerve conduction studies were within normal limits. (Tr. at 746-47). Dr. Lewis recommended physical therapy. (Tr. at 780). Claimant began receiving therapy and attended a total of six sessions before unilaterally deciding to stop treatment. During the therapy course, Claimant cancelled four sessions and was a "no show" at six additional sessions out of the twenty scheduled sessions. (Tr. at 752, 758).

In May 2009, Dr. Wagner was asked by Claimant's attorney to provide answers to certain questions related to her alleged disability. (Tr. at 769-70). Dr. Wagner responded by stating that he did not believe Claimant could engage in full-time work because of her severe pain and physical limitations, including depression and arthritis of the knee. (*Id.*). Dr. Wagner noted that he had not been following her back pain. (*Id.*). Dr. Wagner completed a Medical Assessment of Claimant's Ability To Do Work-Related Activities, opining that Claimant was unable to stand or walk more than 15 minutes uninterrupted, sit for more than 30 minutes at a time, lift or carry items heavier than five pounds, and was subject to significant physical, postural, and environmental limitations. (Tr. at 771–74).

### B.    Agency Assessments

### i.    Physical Health Assessments

On June 2, 2004, a state agency physician, completed a RFC assessment and found that Claimant could perform heavy work that required no more than occasional climbing or balancing; frequent stooping, kneeling, crouching, and crawling; and allowed her to avoid concentrated exposure to heights. (Tr. 186–93). The reviewing physician found that Claimant was partially credible and could occasionally lift 50

pounds; frequently lift 25 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (*Id.*).

On February 24, 2005, Rogelio Lim, MD, completed a second RFC assessment of Claimant at the request of the SSA. (Tr. at 358–68). Dr. Rogelio's primary diagnosis was non-cardiac chest pain and COPD with a secondary diagnosis of scoliosis and problems with Claimant's left knee. (Tr. at 358). Dr. Rogelio found that Claimant could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 359). Dr. Rogelio concluded that Claimant could perform at least light work that required no more than occasional postural movements and allowed her to avoid concentrated exposure to extreme cold, vibration, and environmental irritants. (Tr. at 360–65).

On August 2, 2005, Fulvio Franyutti, M.D., reviewed the medical evidence of record and prepared a RFC assessment of Claimant. (Tr. at 462–71). Dr. Franyutti found that Claimant could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 463). Dr. Franyutti concluded Claimant was partially credible and that Claimant could perform light work that required no more than occasional postural movements and allowed her to avoid concentrated exposure to extreme cold, extreme heat and hazards. (Tr. 462–71).

On September 11, 2007, Robert Holley, MD, performed a physical examination of Claimant at the request of the SSA. (Tr. at 574–80). Based on his examination, Dr. Holley diagnosed Claimant with COPD, depression and anxiety, hyperlipidemia, internal derangement of the left knee, and osteoarthritis of the lumbar spine. (Tr. at 577–78). Dr. Holley also diagnosed Claimant with shoulder impingement syndrome

17

and osteoarthritis of her left sacroiliac joint by history.[6]

On April 9, 2008, Amy Wirts, M.D., a state agency physician, reviewed the medical evidence of record and completed a RFC assessment of Claimant. (Tr. at 696–703). Dr. Wirts found that Claimant could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 697). In conclusion, Dr. Wirts stated that Claimant could perform light work that required no more than occasional postural movements and allowed her to avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards. (Tr. at 696–703).

On July 17, 2008, A. Rafael Gomez, MD, a state agency physician, reviewed the medical evidence of record and completed an updated RFC assessment of Claimant. (Tr. at 722–29). Dr. Gomez found that Claimant could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 723). Dr. Gomez concluded that Claimant could perform light work that required no more than occasional climbing ramps and stairs, balancing, stooping, kneeling, or crouching; never required climbing ladders, ropes, or scaffolds or crawling; and allowed her to avoid concentrated exposure vibration, and hazards. (Tr. at 722–29).

On August 20, 2009, Dr. Beard performed a second physical examination of Claimant at the request of the SSA. (Tr. at 807–13). Claimant's complaints were consistent with her medical records: trouble breathing; chest pain; knee, back, and

---

[6] The sacroiliac joint is the joint formed by the sacrum and ilium where they meet on either side of the lower back. The joint bears the leverage demands made by the trunk of the body as it turns, twists, pulls, and pushes. When these motions place an excess of stress on the ligaments binding the joint and on the connecting muscles strain may result. *Mosby's Medical Dictionary*, 8th edition, 2009.

neck pain; and a history of fibromyalgia. (Tr. at 807–812). After the examination, Dr. Beard concluded that Claimant had left knee internal derangement status with possible osteoarthritis; chronic lumbosacral strain and left radicular symptoms with MRI evidence of L5-S1 disc herniations and possible left nerve root impingement; noncritical coronary artery disease; chest pain, consistent with stable angina; and asthma/COPD. (Tr. at 812).

Dr. Beard also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" in which he opined that Claimant could lift and/or carry 20 pounds frequently and 50 pounds occasionally; stand and/or walk about 4 hours total in an 8 hour day, 1 hour without interruption; sit about 4 hours total in an 8 hour day, 2 hours without interruption; frequently reach; frequently push/pull bilaterally with the upper extremities; and occasionally operate foot controls with the left lower extremity. (Tr. at 814–19). Dr. Beard noted certain postural and environmental limitations, including: occasionally climbing ramps/stairs, stooping, kneeling, or crouching; never climbing ladders or scaffolds or crawl. (*Id.*). Further, Dr. Beard found that Claimant must avoid hazards such as machinery or heights, and may have only occasional exposure to moving mechanical parts, humidity and wetness, vibration, cold, dusts, odors, gases, and pulmonary irritants (*Id.*).

### ii.     Mental Health Assessments

On July 13, 2003, Joseph Kuzniar, Ed.D, completed a Psychiatric Review Technique (PRT) of Claimant.  (Tr. at 448–61). Mr. Kuzniar found that Claimant's impairments were not severe, noting that Claimant suffered from depression that did not satisfy the diagnostic criteria for an affective disorder. (Tr. at 451). Mr. Kuzniar opined that Claimant's limitations with respect to social functioning, daily living,

concentration, pace, and persistence were all mild. (Tr. at 458).

On June 12, 2004, Holly Hoback Clark, MD, completed a second PRT assessment. (Tr. at 194–207). Dr. Clark found that Claimant suffered from depression and anxiety, but these impairments were not severe. (Tr. at 194). Dr. Clark noted that Claimant's limitations with respect to social functioning, daily living, concentration, pace, and persistence were all mild. (Tr. at 204).

On January 25, 2005, Catherine Van Verth Sayre, M.D. at Prestera Center for Mental Health Services, conducted a mental status examination for disability purposes. (Tr. at 354–57). Claimant reported that she had applied for disability due to "bad nerves and depression" and also described a variety of health problems including scoliosis, a chipped disc, torn ligaments in her back, arthritis in her hips, COPD, heart problems, knee problems requiring surgery. (Tr. at 354). On examination, Claimant displayed a depressed mood and a broad affect (Tr. at 356). She displayed a normal immediate memory, a moderately impaired recent memory, and a mildly impaired remote memory but had normal concentration, task persistence, pace and social functioning (Tr. at 356).   Ms. Sayre diagnosed Claimant with Major Depressive Disorder, recurrent, moderate.  She opined that Claimant's prognosis was fair.  (*Id.*).

On March 4, 2005, Rosemary L. Smith, Psy.D., completed an updated PRT assessment of Claimant. (Tr. at 366–79). Ms. Smith found that Claimant's psychological impairments were not severe, noting that Claimant suffered from depression that did not satisfy the diagnostic criteria for an affective disorder. (Tr. at 369). Ms. Smith concluded that Claimant was not entirely credible and noted that Claimant's limitations with respect to social functioning, daily living, concentration, pace, and persistence were all mild. (Tr. at 375–39).

On August 30, 2007, Janice Hunter, M.A., Ed.S., performed a consultative evaluation of Claimant at the request of the SSA. (Tr. at 569–573). Claimant reported no current mental health treatment, stating that she last received care at Prestera Center for Mental Health Services in 2005. (Tr. at 570). Regarding daily activities, Claimant stated that she took care of her personal hygiene; managed her household finances; drove to the store; prepared meals; read, watched television; used the internet; and went to the library. (Tr. at 571). Ms. Hunter diagnosed dysthmic disorder,[7] generalized anxiety disorder, and adjustment disorder with mixed anxiety and depressed mood. (Tr. at 573). Ms. Hunter found Claimant's social functioning, insight, judgment, memory, concentration, persistence, and pace to be within normal limits and placed no functional restrictions on Claimant's ability to work. (Tr. at 572–73).

On April 10, 2008, Timothy Saar, Ph.D., a state agency psychologist, reviewed the medical evidence of record and completed a PRT assessment of Claimant. (Tr. at 705–18). Dr. Saar found that Plaintiff's impairments were not severe, noting that Claimant suffered from depression that did not satisfy the diagnostic criteria for an affective disorder. (Tr. at 708). Dr. Saar concluded that Claimant was credible but noted that Claimant had no limitations with respect to social functioning and daily living, and that her limitations regarding concentration, pace, and persistence were all mild. (Tr. at 715). On July 12, 2008, Jeff Harlow, Ph.D., a state agency psychologist, affirmed Dr. Saar's opinion based on a review and analysis of the evidence in Claimant's case file. (Tr. at 720).

---

[7] Dysthymic disorder is a chronically depressed mood that occurs for most of the day more days than not for at least two years. *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), 4th edition, 1994.

## VI.    Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) Claimant's physical and mental impairments in combination are equal to Listed Impairment 1.04; (2) Claimant's subjective complaints of pain are entitled to full credibility and establish her disability; (3) the ALJ failed to properly consider the opinion of Claimant's treating physicians; and (4) the ALJ incorrectly determined several of Claimant's alleged impairments to be not severe. (Pl.'s Br. at 5–9). In response, the Commissioner argues that substantial evidence supports the ALJ's decision that Claimant is not disabled because: (1) Claimant's impairments do not equal Listed Impairment 1.04; (2) the ALJ reasonably determined Claimant's credibility to be "fair"; (3) the ALJ reasonably weighed the opinion evidence of record; and (4) the ALJ correctly found several of Claimant's alleged impairments not severe. (Def.'s Br. at 12–16).

## VII.   Analysis

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions as lacking merit.  Additionally, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A.    Impairments in Combination

Claimant first argues that her impairments when considered in combination "obviously" equal a listed impairment. Specifically, Claimant contends that her "back disorder closely approaches Listing 1.04 (Disorders of the spine) and is disabling when considered in conjunction with her other health problems." (Pl.'s Br. at 6). The Court finds this argument unpersuasive.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990).  Inasmuch as the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan v. Zebley, supra* at 530 (1990). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531.[8] Accordingly, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms,

---

[8] The Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems." *Id.* At the time of the *Sullivan* decision, Down's syndrome was not an impairment included in the Listing.  Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and  demonstrate fulfillment of the criteria associated with that listing.

and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. "The functional consequences of the impairments . . . irrespective of their nature or extent, *cannot* justify a determination of equivalence. *Id.* at 532, citing SSR 83-19.[9]

In this case, to medically equal Listing 1.04, Claimant must demonstrate a disorder of the spine, which results in compromise of a nerve root and shows evidence of nerve root compression, spinal arachnoiditits, or lumbar spinal stenosis. The ALJ explicitly compared Claimant's clinical findings to Listing 1.04 and concluded that her medical findings, signs, and laboratory data did not meet the severity criteria of the listing specifically because there was no evidence of the requisite motion, motor, or sensory loss. (Tr. at 28). The ALJ went further and compared Claimant's medical findings to the listing for reconstructive surgery of a major weight-bearing joint (Listing 1.03) and ischemic heart disease (Listing 4.04). For these listed impairments, the ALJ examined the delineated criteria and explained his reasons for concluding that Claimant failed to meet or equal the severity level required by the listed impairment. The Court finds the ALJ's determinations were supported by substantial evidence.

If Claimant's argument is not that her impairments are medically equivalent to a listed impairment, but that the overall functional consequence of her combined impairments meets the statutory definition of disability, the analysis shifts from the Listing to the ALJ's RFC findings and the remaining steps of the sequential evaluation. As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately,

---

[9] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zembly, supra* remains relevant to this case.

might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

An examination of the ALJ's RFC assessment confirms that he took into account the exertional and non-exertional limitations that resulted from Claimant's medically determinable impairments. He restricted Claimant to light exertional work based upon her musculoskeletal conditions and limited her exposure to pulmonary irritants in light of her COPD. (Tr. at 29-32). The ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence. To the extent that the ALJ disregarded the impact of some non-severe impairments, such as Claimant's depression and anxiety, he explained his reasons for doing so. (*Id.*).

Moreover, at the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to taken into account Claimant's impairments in combination. He asked the expert to assume that Claimant had the exertional limitations identified in her RFC assessments, as well as additional postural and environmental limitations. Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform certain jobs that existed in significant numbers in the economy. (*Id.*). Therefore, the Court is satisfied that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

## B. <u>Challenges to Credibility</u>

Claimant contends that her subjective complaints of pain are sufficient to establish that she is disabled "in as much as her underlying impairments are capable of producing the degree of pain she alleges" and that she is "entitled to full credibility because her exertional and non-exertional impairments are disabling in nature." (Pl.'s Br. at 6). In support of these contentions, Claimant asserts that her testimony and the medical records are "mutually supportive" and therefore satisfy the requirements of 42 U.S.C. § 423(d)(5)(A). (*Id.*). Relying upon the Fourth Circuit Court of Appeals' opinion in *Hines v. Barnhart,* 453 F.3d 559 (4th Cir. 2006), Claimant emphasizes that "a finding of disability can be based exclusively on subjective evidence of pain if a claimant's impairments can reasonably be expect to produce same." (Pl. Br. at 6). She argues further that the ALJ erroneously failed to explain why he disregarded Claimant's subjective complaints of claim. (*Id.*).

While Claimant correctly cites the case law, her challenge fails for two reasons. First, the ALJ properly employed the two-step process set forth in SSR 96-7p to

determine the severity of the subjective symptoms alleged by Claimant.  Second, the ALJ explained at length why he did not assign full credibility to Claimant's statements regarding the intensity, persistence, and severity of her symptoms. (Tr. at 29–31).

In *Hines v. Barnhart, supra*, the Fourth Circuit reiterated its long-held standard governing the role of subjective evidence in proving the intensity, persistence, and disabling effects of pain, stating "[b]ecause pain is not readily susceptible of objective proof, however, *the absence of objective medical evidence of the intensity, degree or functional effect of pain is not determinative." Id.* at 564-565 (emphasis in original).  Hence, once an underlying medical condition capable of eliciting pain is established by objective medical evidence, disabling pain can be proven by subjective evidence alone.  However, this standard does not require the ALJ to ignore objective evidence that implies the intensity or degree of pain. To the contrary; to the extent that objective evidence exists, the ALJ should consider it. Moreover, in determining the weight to give to subjective descriptions of pain, the ALJ must consider the credibility of the claimant.

Social Security Ruling 96-7p was promulgated to further elucidate the process by which an ALJ must evaluate symptoms, including pain, pursuant to 20 C.F.R. § 416.929, in order to determine their limiting effects on a claimant.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id*. Whenever the intensity, persistence or

severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ should consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this evaluation, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[10] any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);[11] and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[12] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). In *Hines*, the Fourth Circuit Court of Appeals stated,

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical

---

[10] *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1).

[11] *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2).

[12] *See* 20 C.F.R. §§ 416.929(c)(3) & 404.1529(c)(3).

evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Rulings. 20 C.F.R. §§ 404.1529 and 416.929; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ carefully considered Claimant's subjective complaints of pain *and* the objective medical record in reaching a conclusion regarding Claimant's credibility. Significant evidence existed in the record that Claimant's complaints of disabling pain and other symptoms did not correlate with the objective medical evidence or with her own description of her daily activities.

At the outset of the two-step process, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to produce the pain and symptoms described by her. (Tr. at 30). However, the ALJ deemed Claimant's

credibility to be only "fair," finding allegations of disabling symptoms to be "excessive, [and] not fully credible" in light of the objective medical record. (Tr. at 29–30). The ALJ noted that Claimant complained of "lower back and hip pain, aching, burning, stabbing and throbbing pain;" could not sit for long without hurting her knee; had shortness of breath that increased in severity with stress and exertion; angina; depression, panic attacks, trouble concentrating, anxiety; and left hip deterioration. (Tr. at 29). At the same time, Claimant admitted that she did housework and laundry, cooked, ran errands, quilted, paid bills, watched television, and read on a regular basis. (*Id.*).  With regard to Plaintiff's knee impairment, the ALJ noted that Plaintiff last had surgery in 2004 and required no significant treatment since that time, displaying nothing more than a mild limp and crepitus. (Tr. at 29–30). Although Plaintiff used a cane, it had not been prescribed by a physician. (Tr. 30).  Similarly, despite Plaintiff's allegations of disabling back pain, her only treatment had been medication and physical therapy; no surgical intervention had ever been recommended. (Tr. 29). Objective testing showed minimal degenerative changes and no radiculopathy. Physical examinations and nerve conduction studies failed to uncover any neurological disorders or deficits. (Tr. at 29–30). Claimant's cardiac and pulmonary testing also reflected absent, or at most, mild findings. Her stress tests were normal; her primary complaint was intermittent angina. Claimant continued to complain of significant breathing difficulties, yet her pulmonary function studies showed merely a mild obstruction.  Moreover, Claimant continued to smoke.  Contrary to Claimant's allegations of severe psychiatric distress, her mental status examinations verified only a mildly anxious mood and some depression; Claimant was noted to be well-oriented with organized thought processes.  She had normal persistence, pace, concentration

and maintained average social functioning.  Finally, the ALJ noted that in contrast to Plaintiff's testimony, she was able to adequately perform a range of daily activities. (Tr. at 30). Over the course of five years, numerous mental and physical examinations of Claimant were conducted, including: five RFCs (Tr. at 186–93, 358–68, 462–71, 696–703, 722–29), two physical examinations (Tr. at 574–80, 731–33), five PRTs (Tr. at 194–207, 366–79, 448–61, 705–18, 719–22), and two mental status examinations (Tr. at 354–57, 569–73). In all five RFC assessments, the reviewing physicians found that Claimant could engage in *at least* light work. (Tr. at 186–93, 358–68, 462–71, 696–703, 722–29). None of the PRT's found severe psychiatric issues, and the findings on physical and psychological examination were consistent with the PRT and RFC assessments. Accordingly, the Court finds that the ALJ's discussion of Claimant's subjective complaints of pain was sufficient and his conclusions were supported by substantial evidence.

### C.    ALJ's Consideration of the Opinion of Treating Sources

Claimant argues that the ALJ "failed to explain in any meaningful manner why he disregarded the opinions of the Plaintiff's long-time treating physicians." (Pl.'s Br. at 9). Specifically, Claimant contends that the ALJ summarily dismissed Dr. Wagner's opinion and failed to properly address the opinions of Dr. Lewis, Dr. Wade, and Dr. Hawkins. The Court finds this argument unpersuasive.

20 C.F.R. § 416.927(d) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits.  An "accepted medical source" is a licensed physician; licensed or certified psychologist; licensed optometrist for eye disorders; licensed podiatrist for foot disorders; and qualified speech pathologists for speech disorders. 20 C.F.R. 416.913(a).  In general,

the SSA will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 416.927(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2008).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 416.927(d)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the factors listed in 20 C.F.R. § 416.927(d)(2)-(6). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Fourth Circuit's ruling in *Mastro v. Apfel* provides the framework for determining the evidentiary weight to be accorded to a treating physician's opinion:

> "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, according to the regulations promulgated by the Commissioner, a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R § 416.927. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig,* 76 F.3d at 590. *Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence.*

270 F.3d 171, 178 (4th Cir. 2001) (emphasis added). When a treating source's opinion is not given controlling weight, and the opinions of agency experts are considered, the ALJ:

> must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources. . ." 20 C.F.R. § 404.927. The regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

*Id.* § 416.927(d)(2).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions. 20 C.F.R. § 416.927(e).  In both the aforestated regulations and Social Security Ruling 96-5p, the SSA addresses how medical source opinions are considered when they encroach upon these "reserved" issues; for example, opinions on "whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is; . . . and whether an individual is

'disabled' under the Social Security Act. . ." Opinions concerning issues reserved for the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."  SSR 96-5p at 2. However, these opinions must always be carefully considered and "must never be ignored." *Id.*

With this framework in mind, the Court scrutinized the ALJ's assessment of the treating source opinions. First, Claimant asserts that the ALJ improperly dismissed Dr. Wagner's opinion that Claimant was unable to work. In May 2009, Dr. Wagner opined that Claimant could not engage in full-time work because of her severe pain and physical limitations, including depression and arthritis of the knee. (Tr. at 769–70). Dr. Wagner completed a Medical Assessment of Claimant's ability to do work, which indicated that Claimant was unable to stand or walk more than 15 minutes uninterrupted, sit for more than 30 minutes at a time, lift carry items heavier than five pounds, and was subject to significant physical, postural, and environmental limitations. (Tr. at 771–74). The ALJ discounted these opinions, finding that they were inconsistent with the degree of restriction recommended in all five RFC evaluations, the opinions of Dr. Beard, the consultative examiner, and most importantly, Dr. Wagner's own treatment notes and medical documentation.[13] (Tr. at 31).  In view of the opposing evidence, the ALJ found that Dr. Wagner's recommended restrictions were

---

[13] All five RFCs and Dr. Beard found Claimant to be capable of light work. (Tr. at 186–93, 358–68, 462–71, 696–703, 722–29, 814–19).

"extreme." The ALJ pointed out that Claimant had not had back surgery; had only limited and conservative treatment for her symptoms; and had no persistent complaints about her knee. (*Id.*). Furthermore, Dr. Wagner's opinion that Claimant was "unable to work" was not entitled to controlling weight, or even special significance, because it addressed an issue reserved to the Commissioner.

Second, Claimant alleges that the ALJ failed to consider the opinion of Dr. Hawkins. Contrary to Claimant's contention, the ALJ expressly considered Dr. Hawkins' opinion and found that it was limited in scope and, therefore, was not controlling.[14] (Tr. at 31).   Following Claimant's involvement in a motor vehicle accident, Dr. Hawkins wrote a note indicating that Claimant was "unable to work" due to the accident. (Tr. at 592–594). The ALJ concluded that this opinion was entirely related to the acute after effects of the accident and was likely "short-term" in nature; particularly, in light of the documented improvement in Claimant's condition after Dr. Hawkins wrote the note.  The ALJ explained "testing after the claimant's motor vehicle accident was largely negative with the only long-term injury being noted as a shoulder injury." (Tr. at 31). Therefore, Dr. Hawkins opinion reflected simply a "short-term preclusion from work rather than long-term disability." (*Id.*).

Third, Claimant argues that the ALJ failed to consider the opinions of Dr. Lewis and Dr. Wade. The ALJ's decision reflects his meticulous review of the medical records in evidence.  Although the ALJ does not always specify the health care provider who supplied the diagnosis and treatment, his decision thoroughly covers Claimant's medical care.   Moreover, neither Dr. Wade nor Dr. Lewis provided any explicit

---

[14] The ALJ inadvertently attributes this opinion to "Dr. Walker." (Tr. 31).

opinions on Claimant's functional limitations or ability to engage in basic work activities. Dr. Wade primarily treated Claimant's asthma and allergies, which he controlled with various medications. During Claimant's course of treatment with Dr. Wade, he did not place any physical restrictions on Claimant. (Tr. 776, 781, 792–93, 795–97, 802, 804).[15]   Likewise, Dr. Lewis treated Claimant's complaints of tremors and back pain; however, he did not restrict Plaintiff's daily activities or limit her ability to work. (Tr. 567–68, 749–51, 782–83). In short, while Dr. Wade and Dr. Lewis diagnosed and treated Claimant's symptoms, neither offered any medical opinion as to Claimant's functional capabilities or limitations. In contrast, the ALJ had multiple physical examinations and opinions by agency experts who provided targeted assessments of Claimant's exertional and nonexertional limitations.  In light of the extensive medical records available to the ALJ, the conflicting treatment notes of Dr. Wagner, and the detailed discussion of the care and treatment provided to Claimant's by her many physicians, including Dr. Wade and Dr. Lewis, the Court finds the ALJ's consideration of the treating physicians' opinions was complete and consistent with the applicable regulations.

### D.   <u>Mental Impairments as Non-Severe</u>

Claimant's final challenge concerns the ALJ's finding that Claimant's "dizziness, chronic obstructive pulmonary disease, depression and anxiety disorder are non-severe even though the record is replete with evidence otherwise." (Pl.'s Br. at 11).[16]

---

[15] The ALJ did, in fact, discuss Dr. Wade's treatment notes despite Claimant's assertion to the contrary. (Tr. at 31).

[16] For the purposes of this challenge, the Court will specifically address only the finding pertaining to Claimant's mental impairments, as those impairments required a slightly different method of assessment than the alleged physical impairments.

The Court finds this conclusory argument by Claimant to be without merit because it is contrary to the objective medical evidence and to the express written decision of the ALJ.   The ALJ provided a sufficient explanation for his conclusions that Claimant's dizziness and COPD were not severe; he was not required to belabor the absence of objective medical findings, which established more than mild limitations secondary to these medical conditions.   (Tr. at 25-27, 30-31).   In addition, the Court finds, as follows, that the ALJ correctly evaluated and rated the severity of Claimant's mental impairments.

When evaluating the severity of a mental impairment, the ALJ must apply the special technique set forth in 20 C.F.R. § 416.920a. After confirming the existence of a medically determinable mental impairment, the ALJ evaluates its severity by rating the degree that the impairment interferes with the claimant's "ability to function independently, appropriately, effectively, and on a sustained basis" in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.   20 C.F.R. § 416.920a(c).   To perform this rating, the ALJ considers all relevant and available medical information, as well as statements of the claimant and others regarding the effects of the impairment; the impact of treatment on the claimant's symptoms; descriptions of daily activity; and any other information available in the record that assists in providing a "longitudinal picture of [the claimant's] overall degree of functional limitation."   *Id.*   The ALJ uses a five point scale to describe the extent of limitation in the first three functional areas:   none, mild, moderate, marked, and extreme.   He or she then counts the number of episodes of decompensation on a scale from one to four or more.   *Id.*

In the instant case, the ALJ fully reviewed and evaluated Claimant's mental

health impairments, using the special technique, and concluded that Claimant's mental impairments did not cause "more than a minimal limitation in the claimant's ability to perform basic mental work activities." (Tr. at 26). At step two of the sequential evaluation, the ALJ confirmed that Claimant's symptoms met the descriptive criteria ("A" criteria) of an affective disorder (12.04) and an anxiety-related disorder (12.06). Accordingly, the ALJ rated the severity of Claimant's restrictions in each of the four broad functional categories, known as "B" criteria, observing that Claimant was mildly restricted in activities of daily living, social functioning; and concentration, persistence and pace. (Tr. at 25–27). Claimant had no episodes of decompensation. (*Id.*). The ALJ then reviewed the "C" criteria and found that Claimant's impairment did not meet or equal the level of severity set forth in those criteria. (*Id.*).

The ALJ's findings regarding the severity of Claimant's mental impairments are supported by substantial evidence. The medical record contains five PRTs (Tr. at 194–207, 366–79, 448–61, 705–18, 719–22) and two mental status examinations. (Tr. at 354–57, 569–73). Each of these evaluations conclude that Claimant's depression and anxiety are not severe and produce only mild restrictions, at most, on Claimant's daily functioning. Some of the reviewers opined that Claimant's symptoms did not satisfy even the descriptive "A" criteria of depression and anxiety. Claimant did not actively seek crisis intervention or counseling, and none of her treating physicians recommended care more individualized or intensive than standard psychotropic medication. The ALJ noted that Claimant cooked, cleaned, used public transportation, paid the bills, did the laundry, cared for her children, shopped, quilted, and cared for her personal grooming and needs independently. (Tr. at 26). She related no significant difficulties with adapting to the tools of daily life, completing projects, or

maintaining normal social relationships. *Id.* Accordingly, the evidence substantially supports the ALJ's finding that Claimant's mental impairments were not severe.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**:  September 7, 2011.

_____
Cheryl A.  Eifert
United States Magistrate Judge